J-S64014-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| S.M.W. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| J.L.B. | |
| Appellee | No. 871 WDA 2014 |

Appeal from the Order April 22, 2014
In the Court of Common Pleas of Blair County
Civil Division at No(s): 2011 GN 945

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and LAZARUS, J.

MEMORANDUM BY LAZARUS, J.:                **FILED NOVEMBER 7, 2014**

S.M.W. ("Father") appeals from the order entered in the Court of Common Pleas of Blair County denying his petition for special relief in this custody matter.  We affirm.

J.L.B. ("Mother") and Father are the parents of B.K.W., born in September 2004, who is the subject of this custody dispute.  Mother and Father were never married.  In 2008, B.K.W. was found dependent and placed in foster care temporarily.  Both parents have a history of drug abuse, which rendered them unable to parent B.K.W. at that time.  There is also a history of domestic violence.

On July 15, 2013, the parties entered into an agreed order of custody, wherein Mother had primary residential custody and Father had partial

physical custody.[1]    Father filed a petition to modify custody, seeking primary residential custody. The court held a hearing in April 2014. Thereafter, the court entered an order denying Father's petition for modification.   Father filed a timely notice of appeal, along with a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) (Children's Fast Track Appeals).

On appeal, Father raises the following issues for our review:

1. Whether the court erred by placing too much weight on the past and present allegations of abuse by Father?

2. Whether the court erred in not placing enough emphasis on Mother's current issues concerning the minor child's stepbrother and the child's terrible attendance at school?

3. Whether the court erred by taking time away from Father due to Mother's belief that this would benefit the child without expert testimony?

In custody modification cases, our scope and standard of review are as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion.   We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations.   In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand.   However, we are not bound by the trial court's deductions or inferences from its factual findings.   Ultimately,

_____

[1] Father had custody every other weekend and every Wednesday after school until Thursday after school, with one additional night after school until 6:30 p.m.

the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***C.R.F. v. S.E.F.***, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

Further, this Court has stated,

[t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer v. Seifert***, 902 A.2d 533, 540 (Pa. Super. 2006) (quoting

***Jackson v. Beck***, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

Under the Child Custody Act ("Act"),[2] the paramount concern is the best interests of the child. ***See*** 23 Pa.C.S. §§ 5328, 5338. Section 5338 of the Act provides that, upon petition, a trial court may modify a custody order if it serves the "best interest of the child." ***See*** 23 Pa.C.S. § 5338. Section 5328 lists sixteen factors the court must consider in that analysis, including abuse/risk factors, and requires the court to give "weighted consideration" to safety factors. ***See*** 23 Pa.C.S. § 5328. In particular, section 5328(a)(2) states:

_____

[2]***See*** 23 Pa.C.S. §§ 5321-5340. Because trial here was held in April 2014, the Act applies to this case. ***See C.R.F.***, 45 A.3d at 445 (holding that, if the custody evidentiary proceeding commences on or after the effective date of the Act, i.e., January 24, 2011, the provisions of the Act apply).

- 3 -

> The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

23 Pa.C.S. § 5328(a)(2).

In his first issue, Father argues that the court erred in placing too much weight on past allegations of abuse, including a prior PFA that Mother had filed against him, which the court granted, as well as Mother's testimony of domestic violence, threats, and an assault by Father that caused her to suffer a collapsed lung. Father acknowledged assault charges with respect to other males,[3] and admitted there was a PFA against him with respect to Mother; however, he denied any allegations of abuse against the child. N.T. Custody Hearing, 4/8/14, at 6, 59-60, 83-85. Father also contends that since the domestic abuse was in the past, four years prior to the hearing, the weight the court placed on this evidence was in error. We disagree.

The fact that Father's violence was aimed at Mother and others, and not toward B.K.W., does not render this factor any less significant, especially in light of the statute's mandatory language that the court give "weighted" consideration to safety and risk factors. *See* 23 Pa.C.S. § 5328. Further, the abuse factor is not limited to abuse toward the child. The statute

---

[3] Mother testified that Father came to her home and assaulted her boyfriend, and she stated that she is afraid of him. N.T. Custody Hearing, 4/18/14, at 88-89.

specifically requires that the court consider whether there is a "continued risk of harm to the child **or an abused party**." 23 Pa.C.S. § 5328(a)(2) (emphasis added).[4] We find no error.

Father next claims the court erred in not placing enough emphasis on Mother's current issues concerning the minor child's stepbrother, age 13, who resides with Mother and B.K.W., as well as issues concerning both B.K.W.'s and stepbrother's attendance at school. Father argues that B.K.W.'s absences were on days when he did not have custody and that stepbrother had terrible attendance at school as well, indicating Mother had no control over the household.[5]

Father testified that B.K.W. missed twenty-one days of school in a two and one-half-month period, that he was frequently late for school, and that although Mother claimed the absences were due to illness, Father disagreed.

_____

[4] We note that Mother also testified that B.K.W. told her Father hits his girlfriend, and that B.K.W. "goes into his room and turns his TV up the whole way and jumps on the bed to try to not hear it." N.T. Custody Hearing, 4/08/14, at 89. Father's girlfriend denied this, stating that if he were physical with her, she "would have him arrested." *Id*. at 144.

[5] Mother's response to the question of why her other son, B.K.W.'s stepbrother, had poor attendance at school was "Damian chooses not to go to school and doesn't want to follow my rules." N.T. Custody Hearing, 4/08/14, at 108. At that time, stepbrother was thirteen years old. Mother did state that she tries to make him go to school, but she cannot physically get him up and carry him. *Id*. at 109. She also stated that he was in the Truancy Protection Program to try to get back into school. *Id*. Mother clarified Father's statement that stepbrother had broken into a vehicle; she stated that he and his friends had thrown a rock at a vehicle and it broke the window. *Id*. at 111.

He testified that when he questioned B.K.W. about why he missed school, the child related that it was because Mother overslept. *Id*. at 9. Father stated that stepbrother "likes to beat up on his little brother," *id*. at 13, and that Mother's characterization of the fighting as "what brothers do" is misleading. Father also testified about a DUI Mother received while B.K.W. was in the car, that she has had drug relapses and used crack cocaine, and that B.K.W. tells him there are people coming in the house and sleeping on a mattress on the floor. *Id*. at 14-15. Essentially, Father claims it would be in B.K.W.'s best interests to grant him primary custody because he does not believe that B.K.W. lives in a safe environment. *Id*. at 17. Father stated:

> It doesn't seem like my son is in a very safe environment. He is not making it to school. He is not making it to baseball practices at all. I make sure that he attends school every day. I make sure that he has a home-cooked meal in him every day. I make sure that he goes to baseball practice. I spend time with him. We do things together as a family. I just think the environment that I provide is a lot better for learning morals and values and respect and get an education and growing up and becoming somebody. . . . Because he didn't make it to school for so many days they threw him off the [school] basketball team. . . . Also, they were going to put him back in regular classes, but since he missed so many days of school and got behind, they wouldn't allow him to go back into regular classes either. I'm concerned about everything. I'm concerned about not going to school. I'm concerned, you know, that he doesn't make it to his sports. I'm concerned that his [step]brother is . . . not a very good person, and I'm afraid [B.K.W.] is going to start copying him. [Stepbrother] has been caught smoking; he's been caught with marijuana in his room. . . . He is breaking into cars; he's been arrested and put away. . . . I'm asking the Court to let me have full custody so I can make sure that [B.K.W.] gets to school every day, that [he] gets to his sports and that [he] grows up with an education and learns respect and morals and values and

can grow up and become something because the road he is on now, it's bleak.

*Id*. at 17-21.

Father points out in his brief that there was no testimony that B.K.W. had excessive absences from school while in his custody, nor was there any testimony regarding an unsafe environment or any abuse and/or neglect while B.K.W. was in Father's custody.

Our comprehensive review of the record from the custody hearing indicates that there are safety risks in both households. Both parties clearly care for the child, and yet both parties struggle with failings that have adversely affected their child. Mother has admitted her history of drug use, in particular cocaine. *Id*. at 114. She also admitted that she had a relapse in 2011, stating that she used crack cocaine once when her children were with a sitter. *Id*. at 115. Father acknowledged his previous assaults, as well as prior DUIs.

Father also acknowledged that he did not give B.K.W. his prescribed medication.[6] Father testified that the medication had adverse effects on B.K.W., that it was like giving "poison" to his son and he could not do it. He stated, "I saw what it was doing to my child, and I can't bring myself to give

_____

[6] B.K.W. has been diagnosed with AD/HD (Attention Deficit Hyperactivity Disorder) and ODD (Oppositional Defiance Disorder), as well as a mood disorder. B.K.W. was three years old when he was diagnosed and began treatment. N.T. Custody Hearing, 4/8/2014, at 74.

it to him because of what it does to him and the harm it is causing him. As a parent, I can't do that." *Id*. at 54. Mother testified that B.K.W. spends Wednesday evenings with Father, and Father does not give him his AD/HD medication on Thursday morning before school; therefore, Mother claims, B.K.W. invariably gets into trouble in school on Thursdays. *Id*. at 81. She testified this occurs on Mondays at school as well after B.K.W. has spent the weekend with his Father. *Id*. As a result, the trial court included in a prior order, in April 2011, the requirement that Father cooperate with administering B.K.W.'s medication. *Id*. at 81-83. Father's testimony, however, indicates that he is adamantly opposed to giving B.K.W. his medication.

Allison Seltzer, who holds a master's degree in Clinical and Counseling Psychology, testified that she is B.K.W.'s therapist, that B.K.W.'s behavior had decompensated in the last several months, and that B.K.W. indicated to her that when he did not take his medication it was difficult for him to be calm and he does not do as well in school. *Id*. at 132. Seltzer stated that B.K.W. also indicated to her that he does not get his medication when he visits Father. *Id*. at 133. Additionally, Seltzer testified that B.K.W. witnessed violent behavior in the past, that she had recently diagnosed B.K.W. with PTSD (Post Traumatic Stress Disorder), and that when Father

makes derogatory statement about Mother, "the trauma continues." *Id*. at 135.[7]

Dr. Peggy Nadenichek, a licensed psychologist, also testified. She stated that she had been contacted by Father for the purpose of counseling B.K.W., beginning in April 2013. N.T. Custody Hearing, 4/11/14, at 6. Dr. Nadenichek stated that B.K.W.'s main complaint about living with Mother involved "his brother beating up on him. That's pretty much what he didn't like about his mom's house." *Id*. at 8. She stated:

> [I]t appears to be a constant. In one of my sessions, he was happy that two days had passed, that [his brother] had not beat up on him, and, you know, he was asked to keep secrets about cigarettes and things like that. So, he – now, it was a constant. It was not just every once in a while sibling problem.

*Id*. Additionally, Dr. Nadenicheck reported that B.K.W. gave her various reasons for his absences from school:

> [H]e would say because of his headache or a stomachache and then he would say because his mom didn't get him up and he was very concerned about missing so much school because he wanted to get good grades. He valued good grades and he was worried that he would not get good grades if he missed so much school. . . . [I]t was very confusing to me [with respect to sleeping arrangements]. He has a bed there and I think sometimes he was able to sleep in it; sometimes he wasn't. Sometimes he stayed with his mom but if she had someone over, he couldn't stay there. I believe a relative was there at one point and used his room. So, I really could not get a very clear answer from [B.K.W.] as to where he slept on a regular

_____

[7] Seltzer testified: "Statements that she is on drugs, that she smokes crack; that . . . there are "effing N's" under her bed." *Id*. at 136.

basis. [H]e had mentioned sleeping downstairs; I believe it was the couch.

*Id*. at 9-10. Dr. Nadenicheck also testified as to her conversation with B.K.W.'s teacher and the teacher's reported observations, which, essentially, were not consistent with either Mother's testimony or that of therapist Seltzer:

> [His teacher] really likes [him] and just wanted to be open with the information she shared and she felt that she could not – there was no set pattern to his behavior related to medication taking, except she did notice that when he started up again in October after Dr. Cho prescribed the Concerta, he wasn't the same bubbly child that he had been but she did state that B.K.W. has said he doesn't always take it at his mom's; he doesn't take it always at his dad's so she never saw any real pattern to his behavior consistent with knowing when or when he wasn't taking his medicine.

*Id*. at 11. Dr. Nadenichek acknowledged B.K.W.'s anger problems and the ODD diagnosis; however, she was guarded with respect to the AD/HD diagnosis.

The record contains blatant inconsistencies in each party's characterizations of what occurs in the other's household, as well as conflicting expert testimony. The trial court was in the unenviable position of having to sort through these discrepancies, and this Court must defer to the determinations of the trial court as to the credibility and weight it gave to each party's testimony. *See C.R.F.*, 45 A.3d at 443. Therefore, Father's claim that the court placed too little weight on the sibling situation is insufficient, in itself, to find error or an abuse of discretion.

In his final issue, Father argues the court erred in awarding Mother primary custody during the school week, thereby taking time away from Father's custody, without expert testimony. He argues the court relied only on Mother's testimony that this would benefit B.K.W. He also argues that Mother's household is not conducive to better attendance at school, that stepbrother is a bad influence on B.K.W., and that stepbrother's actions toward B.K.W. border on abuse. In sum, Father claims the court did not place enough weight on the stability factor, *see* 23 Pa.C.S. § 5328(a)(4) ("the need for stability and continuity in the child's education, family life and community life"), and, therefore, its decision was error.[8] We disagree.

First, we note that the court relied on more than Mother's testimony; both parties presented witnesses and the court had a sufficient record before it. The court acknowledged its concerns with the sibling relationship and questioned whether B.K.W.'s interactions with stepbrother were in B.K.W.'s best interests. However, rather than weighting this against Mother, the court chose to place no weight for either party with respect to the "sibling relationship" factor, *see* 23 Pa.C.S.§ 5328(a)(6). In light of the conflicting testimony, this was not an abuse of discretion.

The trial court also considered the fact that Father did not attend any school conferences, that Father was not compliant in dispensing B.K.W.'s

_____

[8] We note that neither party sought to have B.K.W. interviewed by the court.

AD/HD medication, and that he was not compliant with any of the requests for evaluations by Blair County Child Youth and Families.[9] In fact, the court's April 5, 2011 order directed Father to insure B.K.W. take his medication as prescribed. Father testified that he will not comply with this provision of the order, and the court noted Father's pattern of disregarding court orders. **See** Trial Court Opinion, 4/22/14, at 16-17. The court, therefore, weighed factor 5328(a)(12) ("[e]ach party's availability to care for the child or ability to make appropriate child-care arrangements") slightly in favor of Mother.

The court also weighed factor 5328(a)(13) ("[t]he level of conflict between the parties and the willingness and ability of the parties to cooperate with one another") in favor of Mother. The court noted that Mother testified she was willing to talk with and cooperate with Father, whereas Father testified he did not want to speak with Mother, had no respect for her, and all communications and arrangements were handled by his girlfriend.

The court also weighed factors 5328(a)(14) (history of drug or alcohol abuse of a party) and 5328(a)(15) (mental and physical condition of a party)

_____

[9] On March 17, 2008, the court ordered Father to obtain a mental health and drug and alcohol evaluation. On December 16, 2011, the court reiterated these requirements and ordered Father to provide to the Blair County Custody Office documentary proof of the results of such evaluations and any recommended treatment. Father failed to comply with these orders and provided no reason for his failure or refusal to do so.

in favor of Mother. Although both parties admitted to prior drug addictions, the court found Mother's testimony forthright; she admitted to her 2011 relapse and followed through with drug tests, whereas Father failed a 2011 drug test but never followed through with the court's order that he complete a drug and alcohol evaluation. Further, Father never followed through on the court's order that he complete a mental health evaluation. The court expressed its concern with Father's "unwillingness to follow through with those reasonable directives[.]" Trial Court Opinion, *supra* at 21.

Additionally, with respect to the child's medication and the competing expert testimony, the court stated:

> The child may be overmedicated. However, the Court does not know if this is the case. We wish the parties could work together as parents to determine the appropriate conclusion. However, it is extremely clear that this will not occur soon. It could be that the Father is right and the child does not need the medication. However, a physician has prescribed the medication. In light of this fact the court will not act as a medical expert. The court is therefore left to conclude that the Mother's opinion that the medication helps the child and the fact that the medication is prescribed by a physician that it is proper to continue the medication until the evidence suggests otherwise. **Due to this fact, the Court believes that it is necessary to consider the Mother's request that the Father's periods of partial custody be modified. . . . [She] believes that this is important for stability reasons and believes that it is necessary so that she may be able to give the child the medication before school on the school days since the Father will not do so. We believe that the Mother's request in this regard is reasonable and appropriate. In addition, we do believe that stability through the school week is important for a child that has numerous cognitive disorders that deal with his ability to focus and behave appropriately at school. We believe that this stability through the school week will hopefully provide more**

- 13 -

**structure. We believe that granting the Mother's request at the present time will serve the child's best interests. Therefore, we will fashion an Order that will modify the Father's periods of custody during the school year. We will make up for this by granting him some additional hours during the summer when school is not an issue.**

*Id*. at 21-22 (emphasis added).

Contrary to Father's claim, the court clearly relied on much more than Mother's sole testimony in reaching its decision. After our review of the parties' briefs, the record, and the relevant law, we find that the trial court's conclusions are supported by competent evidence in the record. The trial court properly considered the section 5328(a) factors, explained how it weighed the relevant factors, and determined that it was in B.K.W.'s best interests to deny Father's petition for modification, to award the parties shared legal and physical custody of the child, and to award Mother primary residential custody and Father partial physical custody.[10] *See C.B. v. J.B.*, 65 A.3d 946, 950 (Pa. Super. 2013) (court must delineate reasons for

_____

[10] The court's order awarded Father partial physical custody as follows: during the school year: every other weekend (Friday after school until Sunday at 6:30 p.m., every Wednesday and Thursday after school until 6:30 p.m.); During the summer months, Father shall have partial physical custody every other weekend from Friday at noon until Monday at 8:00 p.m. and every Wednesday from noon until Thursday at 8:00 p.m. Father shall also have a partial custody from 11:00 a.m. to 8:00 p.m. on those Mondays following the weekends that Father does not have partial custody. Additionally, both parties shall have a consecutive two-week period with child during the summer months. The court set forth a holiday schedule, and also stated in the order that Father comply with "all reasonable requests of the child's treating physician regarding medication." *See* Order, 4/22/14.

decision when making award of custody either on record or in written opinion; mere recitation of statute and consideration of § 5328(a) factors *en masse* is insufficient). We find no error or abuse of discretion. **C.R.F**., **supra**.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/7/2014